# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 26, 2013 Session

## STATE OF TENNESSEE v. CHAD MEDFORD

**Appeal from the Criminal Court for Knox County**
No. 94127      Jon Kerry Blackwood, Judge

---

**No. E2012-00335-CCA-R3-CD - Filed June 5, 2013**

---

The defendant, Chad Medford, appeals his Knox County Criminal Court convictions of felony murder, aggravated burglary, especially aggravated kidnapping, especially aggravated robbery, and employing a firearm during commission of a dangerous felony, claiming that the trial court erred by denying his motion to suppress the statements he made to police and by denying admission of his unedited statement at trial, that the evidence was insufficient to support his convictions, and that the trial court erred by admitting certain witness testimony. The defendant also challenges his sentence alignment. Discerning no reversible error, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Chad Medford.

Robert E. Cooper, Jr., Attorney General and Reporter; DeShea Dulany Faughn, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case relate to the May 2009 invasion of the home of Bill and Vickie Graves and the resulting murder of Bill Graves.

At trial, Jeanne Stafford testified that she had lived next door to the Graveses for 25 years and that she was a close friend of theirs. Only a few houses were situated on their small street, and they all participated in a neighborhood watch of sorts, keeping an eye

on their neighbors' houses when the residents were away from home. In the late summer of 2008, Mrs. Graves contacted Ms. Stafford to tell her that she would be gone the following day for a few hours, and Ms. Stafford knew that Mr. Graves would be at work.

The next morning, as Ms. Stafford sat at the computer in the front room of her house, she noticed a van drive slowly down the street. A few moments later, the van returned. When Ms. Stafford went into her kitchen, she noticed that the van had backed into the carport of the Graves's house, and the rear doors of the van were open. Ms. Stafford immediately walked to the Graves's house. She found two men standing on the front porch, and she noticed "they were kind of kicking something." She asked them what they were doing, and one of the men ran over to her, assuring her that everything was alright and insisting that Ms. Stafford knew who he was. When she replied that she did not know him, he identified himself as Chad Medford, Mrs. Graves's nephew. Ms. Stafford informed him that the Graveses were not at home and again inquired what he was doing at their house. He told her that he had come to get some money from Mrs. Graves to take his niece to the zoo. Ms. Stafford told him she would pass along the message. The defendant and the man with him then drove away in the van. After the men left, Ms. Stafford noticed that a surveillance camera on the front porch had been repositioned to face away from the front door of the house.

Mrs. Graves testified that her nephew, Tony, had been married to the defendant's half-sister, Tiffany Wood. In 2002, Tony suffered a debilitating stroke. Two years later, Ms. Wood decided to leave him, and Mrs. Graves began caring for him. Mrs. Graves kept Tony's pain medication and Methadone at her house and would deliver it to him three times a day. She testified that Ms. Wood "and whoever Tiffany told" knew that Mrs. Graves kept the medication at her house. Mrs. Graves stored Tony's medication in a small safe inside a closet in their living room. She testified that the only people who knew about the safe were her husband, their son, Ms. Wood, the defendant's other sister, Laura Burnett, and "more than likely" the defendant.

While caring for Tony, Mrs. Graves found a life insurance policy worth $100,000 that Ms. Wood had taken out on him in November 2002. Tony had known nothing about the policy. He had the insurance company change the beneficiary from Ms. Wood to Mrs. Graves. After his death in 2004, Mrs. Graves received a check from the insurance company for $100,000, and as far as she knew, the only people who were aware of the payment were her husband, her son, and Ms. Wood.

In the late summer of 2008, Mrs. Graves received a telephone call from Ms. Stafford informing her that the defendant and another man had been at the Graves's house. Mrs. Graves testified that the defendant had never been in her driveway before and that he

had no reason to be at her house that day. When Mrs. Graves arrived back at her house, she discovered that the video surveillance camera on the front porch had been moved and was no longer facing the front door. The defendant never contacted Mrs. Graves to explain why he had visited her house.

In December 2008, Mrs. Graves encountered the defendant at a local store. He mentioned that Ms. Stafford had "pissed [him] off" when she confronted the defendant at the Graves's house that past summer and that it had made him "madder than hell." Mrs. Graves then contacted Ms. Burnett and told her to tell the defendant that he was no longer welcome at her house. Mrs. Graves also told Ms. Burnett that the surveillance camera had "got a good picture of him and the boy that was with him, and if anything ever got gone at the house, that it would be [the defendant], and [she would turn] it over to the police."

On the evening of May 2, 2009, Mr. and Mrs. Graves were watching a movie in their living room. At least three of their cars were parked next to their house, in the vicinity of the carport and driveway, and their front door was open so that they could hear the rain falling on their tin roof. Mrs. Graves heard the driveway sensor, and then an exterior floodlight came on. Mr. Graves went to the door to investigate, at which time a man, later identified as Josh Bowman, ran into the house and grabbed Mr. Graves. Before Mrs. Graves had time to react, a second man, later identified as Gary Holman, ran into the house with a gun. Mrs. Graves jumped up, and Mr. Holman ordered her to sit down, putting the gun to her head. At that point, Mr. Graves freed himself and began running toward the bedroom, with Mr. Bowman following him. A few seconds later, Mrs. Graves heard a "pop." She began screaming for her husband, but he did not respond.

Mrs. Graves pushed Mr. Holman away from her and retrieved one of her husband's guns, a Colt .45, which was located nearby. She attempted to fire the gun at Mr. Holman, but she could not release the gun's safety lock. Mr. Holman then tackled Mrs. Graves and tried to wrest the gun away from her. During this altercation, Mrs. Graves heard Mr. Bowman call out to Mr. Holman to "[g]et the safe." Mrs. Graves reached up and pulled away the bandana and toboggan that were obscuring Mr. Holman's face. She did not recognize him, but the bright light from the television gave her a good look at his face. She pushed Mr. Holman and attempted to run toward the bedroom, but Mr. Holman tackled her again, pushing her face-first into the loveseat. Mr. Holman bit Mrs. Graves on the arm and took the gun from her. At that time, he walked to the closet behind the front door and retrieved the safe. Mr. Bowman then appeared, and the two men left the house, taking only the safe and the Colt .45 with them. Both Mrs. Graves's pocketbook and Mr. Graves's wallet were in view near the front door, but the two men did not touch them.

After the men left the house, Mrs. Graves ran to her husband, who was lying

-3-

on the floor between the bedroom and the living room, bleeding profusely from a wound in his upper thigh. Mrs. Graves called emergency services, who arrived a short time later. Mr. Graves was transported to the hospital, where he died the following day.

Mrs. Graves testified that the only items in the safe that Mr. Bowman and Mr. Holman stole were coins: quarters, half-dollars, and silver dollars. She had disposed of Tony's medication after he died, and the proceeds from the life insurance policy had been deposited in a bank account.

Natosha Wise, an emergency medical technician with Rural/Metro emergency services, testified that she arrived at the Graves's house on May 2, 2009, and discovered Mr. Graves alert but suffering from extensive blood loss from a leg wound. Ms. Wise assisted in transporting Mr. Graves via ambulance to the hospital. While en route to the hospital, Mr. Graves went into "irreversible shock" due to the blood loss.

Doctor Steven Cogswell, a deputy chief medical examiner for Knox County, testified that he performed an autopsy on Mr. Graves on May 4, 2009. Doctor Cogswell determined that Mr. Graves had suffered a "perforating gunshot wound" to his left buttock, exiting through his left thigh, which severed his femoral artery and vein, causing profuse bleeding. Doctor Cogswell opined that the cause of death was the gunshot wound to the thigh and that the manner of death was homicide.

Sergeant Frank Phillips with the Knox County Sheriff's Department ("KCSO") testified that he was dispatched to the Graves's address. When Sergeant Phillips arrived at the scene, he noticed a safe in the road approximately 100 yards west of the victims' house. When he entered the house, he "could tell it was in a disarray, like people had been in a struggle," and he noticed "bullet holes in the wall" and "lots of blood in the floor." He found Mr. Graves lying on the floor and Mrs. Graves attending to him. Sergeant Phillips secured the area and stayed on the scene until other law enforcement officers arrived.

Officer Mackenzie Alleman with the forensic services division of the KCSO testified that when she arrived at the scene, she noticed a safe in the middle of the road. The safe was open "with the lock in the locked position," and paperwork and coins were scattered around it. Once inside the house, she encountered two spent .45 caliber Winchester shell casings, as well as bullet holes in two of the walls. Officer Alleman also took note of a large gun case in the master bedroom, containing several rifles and shotguns. Just inside the front door of the house, Officer Alleman found a black toboggan.

Detective Krystal Gibson with the KCSO major crimes unit testified that she responded to the scene of the crime on May 2. Detective Gibson spoke with Mrs. Graves at

-4-

the hospital regarding possible suspects, and "[o]ne of the first people that [Mrs. Graves] mentioned was [the defendant]." Detective Gibson spoke with the defendant, who provided investigators with some names of potential suspects, including a man by the name of Jason Smith. On May 7, Detective Gibson showed Mrs. Graves a photographic lineup, and Mrs. Graves incorrectly identified Jason Smith as one of the men who invaded her home on May 2.

Captain Clyde Cowan, supervisor of the KCSO major crimes unit, testified that he reported to the crime scene on the evening of May 2 and that he later went to the hospital to speak with Mrs. Graves. She did not recognize either of the men who had broken into her home, but she did inform Captain Cowan that very few people knew about the location of the safe in her house. Based upon this information, Captain Cowan began interviewing those individuals who did know about the safe.

KCSO Detectives Walt Schmidt and Matt Sexton both testified that they interviewed the defendant on May 7, 2009, based on a tip that the defendant might have been involved in the murder of Mr. Graves. At that meeting, the defendant signed a waiver of his constitutional rights after being provided *Miranda* warnings. The interview lasted approximately 50 minutes, during which time the defendant provided Detectives Schmidt and Sexton with the names of 16 possible suspects. The detectives located and interviewed each of those 16 suspects, among others, but none of them were involved in the crime.

Sometime after May 7, Ms. Burnett contacted the KCSO and informed them that her brother had been involved in the Graves's home invasion. The defendant was brought back to the KCSO on May 12 for a second interview. At trial, the State introduced a redacted copy of the transcript of this interview. At the outset of the interview, the defendant again signed a waiver of his rights. He was initially interviewed by Captain Cowan and Detective Gibson. They both informed him that they knew that he was involved in the murder of Mr. Graves and that he was facing a charge of felony murder. Captain Cowan told the defendant, "We know [you were] driving the car." He also told the defendant, "[W]hether you were there or not don't [sic] matter" because "you was [sic] driving the car that picked them up" and "[t]hat's felony murder." Captain Cowan went on to say that "driving the car and pulling the trigger are a long . . . long way apart," but "it's your choice on which one." As the officers continued to press the defendant to confess, the defendant repeatedly denied any knowledge of or involvement in the murder of Mr. Graves.

Eventually, Knox County Sheriff Jimmy "JJ" Jones entered the interview room. Like Captain Cowan and Detective Gibson before him, he urged the defendant to tell what he knew:

We know you were there we know you didn't go in but we know you were there ok here's your opportunity to talk now so you can get you some help from the DA I just left the DA's office and we've talked about you and he said that it's time for you to talk and tell what you know and if you do that you [won't] have to face the things that the rest of them are going to face ok because the way it is right now is if you don't talk you're gonna face the same exact thing as the other two do exactly. . . . And so now's the time while you have the opportunity to be the one . . . we call it the firstest with the mostest [sic].[1]

Sheriff Jones continued to press the defendant to talk, telling him, "I can't believe you're gonna let this opportunity get by . . . because you're scared . . . to tell on somebody." The defendant steadfastly continued to deny his involvement. The officers then brought Ms. Burnett into the interview room. Captain Cowan testified at trial that the defendant then "realized that we did actually know that he had told somebody else, and that we had that knowledge." In the transcript of the interview, the defendant immediately tells his sister, "You just cost me everything, Laura." When the detectives returned to the interview room, the defendant began to confess. He identified his two accomplices as Josh Burroughs[2] and a man known as Scotty.[3] The defendant stated that Josh "Burroughs" drove a Mercury Marquis that had been towed recently, and based upon that information, the detectives were able to determine that the man in question was actually Josh Bowman. The defendant later identified a photograph of Mr. Bowman, confirming that the KCSO had the correct suspect. The defendant also provided the detectives with Mr. Bowman's cellular telephone number.

The defendant said that Mr. Bowman contacted him and inquired whether the defendant knew of anything they could "do to make a little money." The defendant responded that he "might know somewhere you can get a safe or something" but that he didn't want to be involved in it. He also stated that the Graveses were not supposed to be at home on the evening of May 2 and that he had told his accomplices that if anyone was at home, they were supposed to back out.

Shortly before 8:00 p.m. on May 2, the defendant met the two men in the parking lot of a shopping center, and he drove Mr. Bowman's Mercury Marquis to show the

---

[1]The transcript is devoid of punctuation.

[2]This individual was later identified by the KCSO as Josh Bowman.

[3]This individual was later identified as Gary Scott Holman.

men where the Graves's house was located. The three men drove by the Graves's house, and the defendant stated that he did not believe anyone was at home because Mrs. Graves's vehicle was not there and the front door was closed. After driving by the house, the men returned to the defendant's house, where they "just talked a little bit." As it grew dark outside, the three men returned to the Graves's house. The defendant stated that the front door was closed and that no lights were on at the house. The men parked the car down at the end of the road, and Mr. Bowman and Mr. Holman walked to the Graves's house. Ten to 15 minutes later, Mr. Bowman called the defendant's cellular phone and told him that he and Mr. Holman were returning to the car. When the men arrived at the car, they did not have the safe with them, but they did have some quarters. The defendant claimed he did not realize that Mr. Bowman had taken a gun with him to the house until Mr. Bowman began to cry in the car and say that "he didn't mean to do it." When the defendant asked him what that meant, Mr. Bowman allegedly stated that he "got into a tussle" with Mr. Graves and that Mr. Bowman's gun "just went off," and Mr. Bowman didn't know "if [he] hit him in the head or . . . if [he] hit him in the stomach." Mr. Bowman then asked Mr. Holman if he had "wiped the gun down." Mr. Holman responded that he had wiped the gun down but "didn't wipe the trigger." The defendant gathered that Mr. Holman had taken a gun from Mrs. Graves and that the men had disposed of both guns on the side of the road as they were running toward the car. The three men drove to the motel where Mr. Bowman was staying, and the defendant's fiancée arrived to drive him home. The defendant arrived at home before 11:00 p.m. on May 2.

Following this interview, Captain Cowan located and interviewed both Mr. Bowman and Mr. Holman. At trial, Captain Cowan confirmed that no one from the district attorney's office came to speak with the defendant or offer him any sort of deal.

On cross-examination at trial, Captain Cowan admitted that the KCSO did not know who was involved in the crime until the defendant provided them with information on Mr. Bowman and Mr. Holman. When questioned as to whether he had indicated to the defendant during questioning the possible sentences he could receive depending upon his level of cooperation, Captain Cowan responded, "There are sentences for murder and other charges, and it would be up to the D.A.'s office as to what he was charged with, depending upon his cooperation and truthfulness, and his statement wasn't completely truthful." He testified that, in the discussions with the defendant, "facilitation of felony murder" was never mentioned, but the sentence attendant to that charge was mentioned several times:

> It was a range from the top end of the range to the bottom end of the range, depending on his cooperation and his truthfulness, and like I said, he wasn't truthful, and the investigation, as it went on, we found out how untruthful he had been, and that,

even more, weighed toward the charges.

Captain Cowan acknowledged that, over the course of the defendant's May 12 interview, the difference in potential sentences was mentioned 28 times. He also acknowledged that investigators told Ms. Burnett the length of the potential sentence the defendant could be facing, which led Ms. Burnett to urge the defendant to confess so that he could avoid a lengthy sentence. Captain Cowan admitted that the defendant offered to testify against Mr. Bowman and Mr. Holman at trial, but both men later pleaded guilty and never went to trial.

Following the defendant's confession, Captain Cowan contacted the "on-call" assistant district attorney, and the next day, the defendant was charged with facilitation of first-degree murder. Captain Cowan then explained that, as the investigation progressed, the defendant's level of involvement was higher than anticipated, which led to the new ten-count indictment. In this subsequent indictment, the defendant was charged with three counts of felony murder, two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, two counts of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony.

In the course of her investigation, Detective Gibson examined the cellular telephone records of the defendant, Mr. Bowman, and Mr. Holman, to "corroborate statements and to just see if there was any interaction to all of them before, during, and after the incident." In the defendant's May 12 interview with the KCSO, he stated that Mr. Bowman contacted him "wanting to make some money," and he gave no indication that he was in constant contact with Mr. Bowman. However, the records indicated that the defendant and Mr. Bowman had been in contact on an almost daily basis for more than two weeks leading up to the home invasion. On May 2, the day of the crime, the defendant and Mr. Bowman exchanged 16 telephone calls, and on the days following the crime, the two continued to exchange calls.

Officer Aaron Allen with the KCSO forensic services division testified that when he responded to the crime scene on May 2, he collected two cloth gloves that were found along the roadway near the victims' house. On May 13, Officer Allen returned to the crime scene area to collect a .45 caliber Ruger P97 semiautomatic handgun that was found on the same side of the roadway as the gloves.

Officer Michael McMahan, a crime scene technician with the KCSO, testified that on May 13, 2009, he assisted in processing a Mercury Marquis vehicle. Officer McMahan collected a number of swabs, as well as items from the vehicle's trunk. He also photographed "reddish-colored stain[s]" on the driver's side of the vehicle and in the rear seat. In the trunk, Officer McMahan photographed a black and white bandana, a black

-8-

toboggan, a black glove, and a pair of boots with reddish stains on them.

Tom Finch, an officer in the crime scene unit of the KCSO, testified that, on January 11, 2010, he recovered a Colt .45 pistol across the street from the Graves's house. The gun was found in some mud and "was rusted shut." The chamber of the gun was empty, but there was ammunition in the magazine.

Special Agent Don Carman, a forensic firearms examiner with the Tennessee Bureau of Investigation ("TBI"), testified as an expert witness for the State. In connection with the crime at issue, Agent Carman examined a semiautomatic Colt .45 pistol and seven .45 caliber automatic cartridges. When Agent Carman received the pistol, it "was basically inoperable" and "all rusted shut." After cleaning and restoring the gun to an operable condition, he fired four test shots with the gun and determined that it did not fire any of the bullets found at the crime scene.

Special Agent Kevin Warner, a firearms identification and examination expert with the TBI, testified that he received from the KCSO a Ruger .45 caliber semiautomatic pistol and two cartridge casings. He examined the gun and the cartridge casings and determined that the cartridges had been fired from the Ruger pistol. Agent Warner also examined a bullet and bullet jacket, which he opined had both been fired from the Ruger as well. Agent Warner explained that the bullets he examined were hollow point bullets, which "allow[] the bullet to expand as it hits an object and create a larger wound cavity."

Special Agent Kimberly Bryant, a forensic scientist in the serology/DNA unit of the TBI, testified that she processed a number of items from the crime scene. A pair of work gloves contained Mr. Graves's blood, and when she tested the gloves to determine the deoxyribonucleic acid ("DNA") of the wearer, Mr. Holman could not be excluded. Agent Bryant also examined a pair of boots recovered from the trunk of Mr. Bowman's car and found Mr. Graves's blood on them.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

Based on this evidence, the jury convicted the defendant as charged of felony murder, employing a firearm in the commission of a dangerous felony, two counts of aggravated burglary, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. The trial court imposed an automatic sentence of life with the possibility of parole for the murder conviction. Following a sentencing hearing, the trial court found the defendant to be a career offender and imposed the maximum sentence for

each conviction as required by law. The court merged the two counts of especially aggravated kidnapping and the two counts of especially aggravated robbery and sentenced the defendant to 25 years on both. The court also merged the two counts of aggravated burglary, imposing a sentence of six years, and on the count of employing a firearm during the commission of a dangerous felony, the court ordered the defendant to serve six years as well. All counts were ordered to run concurrently, with the exception of the two six-year sentences, which the trial court ordered to run consecutively to the defendant's life sentence. As such, the trial court ordered an effective sentence of life plus 12 years.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the incriminating statements he provided to law enforcement officers, that the trial court erred in denying the defendant's request to present his unedited statement to law enforcement officers at trial, that the evidence adduced at trial was insufficient to support his convictions, that the trial court erred in admitting the testimony of Jeanne Stafford, and that the trial court erred in ordering consecutive sentencing on the aggravated burglary convictions. We consider each claim in turn.

*I. Motion to Suppress*

The defendant contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to police, claiming that the statements were obtained in violation of his constitutional rights. Specifically, the defendant claims that, during his May 12, 2009 interview at the KCSO, law enforcement officers essentially promised him that he would be charged with facilitation of felony murder if he would cooperate and "give up" the names of his accomplices. The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at the defendant's trial.

At the hearing on the defendant's motion to suppress his pretrial statement, defense counsel acknowledged that nothing in writing indicated that law enforcement officers had made any promises to the defendant. However, counsel argued that the repeated references by Captain Cowan, Detective Gibson, and Sheriff Jones to the defendant's facing 51 years for felony murder as opposed to five years effectively convinced the defendant that he had a deal, which was the basis for his confession.

The trial court[4] denied the defendant's motion to suppress, concluding that

---

[4]Judge Richard R. Baumgartner presided over the hearings on the defendant's motion to suppress (continued...)

-10-

"when you look at the totality of the circumstances here, what caused [the defendant] to acknowledge his involvement in this case was the realization that his sister had told police what she knew that [the defendant] had told her." The court went on to say,

> I don't think that the statement should be suppressed on the basis that some deal was struck, because I don't believe any deal was struck, and I don't believe his will was overborne by the conversation between the authorities and [the defendant]. As I've said four or five times already, I think the crucial point that changed [the defendant's] mind here was the sister's involvement.

Although it is not entirely clear on appeal whether the defendant is complaining that the statements were the product of law enforcement coercion or that the law enforcement officers failed to deliver on their "promise" of leniency, we will address the issue as though the defendant is asserting both. In doing so, we will consider the claims with a few well-settled principles in mind.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the due process clause of the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate

---

[4](...continued)

his statement to law enforcement. In all subsequent proceedings, Judge Jon Kerry Blackwood presided.

provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[5]

Upon our review, we conclude that the record simply does not support the defendant's claim of either coercion or promises. The defendant, in his mid-twenties, was provided with *Miranda* warnings on both May 7 and May 12, and on both occasions, he signed a waiver of his rights. Without question, the defendant's May 12 interrogation was lengthy and intense, but despite this law enforcement pressure, the defendant steadfastly denied his involvement in the crime at least 36 times, even to the sheriff himself. The record supports the trial court's conclusion that Ms. Burnett's entry into the interview room was the tipping point and is what caused the defendant to confess his involvement. Before Ms. Burnett entered the room, absolutely nothing indicates that the defendant was about to break. Indeed, previously, he never equivocated in his denials. However, when he saw his sister, it is clear he then knew that she had told the KCSO about his involvement because his first statement to her was, "You just cost me everything, Laura." As Ms. Burnett talked to him and tried to explain why she revealed his involvement, the defendant stated, "You just broke. . . . This is the second time they've had me down here [and] they let me go," evincing his belief that, but for his sister's statement to law enforcement, he could have – and would have – maintained his innocence.

---

[5]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

Moreover, the statements made by law enforcement officers regarding potential sentences did not amount to promises. After the defendant spoke with Ms. Burnett, and Sheriff Jones and Captain Cowan returned to the interview room, the defendant inquired as to the sentence he would be facing. Sheriff Jones responded:

> Now I'm gonna tell you right off the bat he's not gonna sit down here . . . and let me explain to ya ok he's not gonna sit down here and say ok I'm gonna give you full immunity you tell your side of the story blah blah blah you know tell us what happened they've done that before and then you know what you're liable to say I was the guy that killed him
>
> . . . .
>
> . . . . [W]hat they're gonna do is there [sic] gonna say look in consideration with what you're getting ready to tell the police we'll make a decision on what we charge you with or what we don't charge you with
>
> . . . .
>
> I mean if [the D.A.] was standing right here he'd leave the room and say you gonna have to tell them what they need to know and then they gonna tell me how much of a cooperation you gave and we'll make our decision on that but that's I mean they can't you know come down here and say ok you're clear but like I said there's a lot of things they can do.

Sheriff Jones did tell the defendant that if he cooperated with them, it would be "the greatest benefit to you that you could ever imagine" and that "the good word" law enforcement officers would pass on to the district attorney's office "is gonna make all the difference in the world." However, when viewing these statements against the sheriff's prior admonitions to the defendant that the district attorney's office would decide the charges only after the defendant confessed, it is clear that such statements could not be considered enforceable promises of leniency or a lesser sentence.

On appeal, the defendant, for the first time, advances the theory that, if Ms. Burnett was the proverbial straw that broke the camel's back, then she was acting as a State agent and that the defendant's statement should be suppressed on that basis. "Issues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508

-13-

(Tenn. Crim. App. 1996). Moreover, even if this issue was properly before this court, nothing in the record supports a finding that Ms. Burnett was acting as an agent of the State. *See State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996) (identifying the factors for determination of State agency for a Fourth Amendment violation as "(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search"); *State v. Brandon Ackerman*, No. M2010-01979-CCA-R3-CD, slip op. at 32-33 (Tenn. Crim. App., Nashville, July 13, 2012) (holding the *Burroughs* test applicable to Fifth Amendment violations and citing *United States v. Garlock*, 19 F.3d 441, 443 (8th Cir. 1994) (stating the goal of the test is to determine "'whether the government exercised such coercive power or such significant encouragement that it is responsible' for the conduct of the private party securing the evidence, or that the exercised powers are the 'exclusive prerogative of the government.'" (citation omitted))).

The trial court did not err by denying the defendant's motion to suppress.

## II. Constitutional Right to Present a Defense

The defendant next argues that the trial court erred by denying his request to admit his unedited statement at trial, resulting in an unconstitutional interference with his right to present a defense. The State counters that, if any error exists, it does not require reversal.

During the hearing on the motion to suppress, the trial court ruled that the defense would be entitled to use the defendant's statement to law enforcement officers "in its entirety." At trial, however, the State moved to redact the statement to remove any reference to specific sentence length, because numerous references to 51 years and 15 years at 30 percent, as well as references to probation, appeared in the statement. The trial court granted the State's request on the basis of Tennessee Code Annotated section 40-35-201(b), which provides that, in non-capital criminal cases, "the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." T.C.A. § 40-35-201(b) (2010). The trial court did, however, allow the defendant to conduct cross-examination on "the circumstances under which the statements were given" and granted the defendant the "right to explore . . . anything [law enforcement officers] said to him that would indicate that they were giving him lenient treatment." The trial court only prohibited the defendant from "going into the specific lengths of any sentence."

In this appeal, the defendant claims that the trial court's refusal to admit the entire, unedited statement interfered with his right to present a defense. He claims that admission of the complete statement was necessary to provide context to his admissions to

-14-

the officers and to demonstrate the emphasis the officers placed on the lesser crime of facilitation. The defendant does acknowledge, however, that law enforcement officers never used the term "facilitation" during their interview with the defendant; rather, they referred to the defendant's potential for serving "15 at 30%," which "is the low end of that charge."

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits*, see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

Our supreme court recently addressed a trial court's decision to limit cross-examination to a defendant's redacted statement in *State v. Echols*, 382 S.W.3d 266 (Tenn. 2012). The defendant in *Echols*, facing a charge of felony murder, claimed to investigators that he shot the victim in self-defense. *Id.* at 271-72. During the defendant's interview with police, the investigator emphasized to him that he "could spend the rest of [his] life in jail" or "a little bit of time." *Id.* at 287-88. The trial court redacted these references pursuant to Code section 40-35-201(b). *Id.* at 288. This court held that the trial court erred by refusing to admit the redacted portions of the defendant's interview, and the supreme court agreed, holding that Code section 40-35-201(b) does not prohibit "the introduction of a recorded statement by a witness, made prior to any charge, that a suspect could face 'life in jail' as

opposed to 'a little bit of time' depending on what he tells the interrogating officer." *Id.* The court further held that Code section 40-35-201(b) "neither mandate[s] nor justifie[s] limitations on cross-examination." *Id.* To assist the jury in determining the truthfulness of a defendant's statement to law enforcement, "the jury may hear evidence of the circumstances under which the confession was procured." *State v. Pursley*, 550 S.W.2d 949, 950 (Tenn. 1977). Although the court in *Echols* found that the trial court had abused its discretion in restricting the defendant's cross-examination, the court determined that the error was harmless beyond a reasonable doubt. *Id.* at 289.

Although the redacted statements in the instant case did include specific references to potential penalties, unlike those in *Echols*, we believe the reasoning in *Echols* applies equally here. The defendant was entitled to have the jury review his statement in its entirety, and we hold that the trial court abused its discretion by limiting the introduction of that statement to its redacted version. However, when reviewing the court's decision in light of the factors set forth in *Flood*, we hold this error to be harmless beyond a reasonable doubt. *See State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) ("The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless."). In cross-examining Captain Cowan, defense counsel was able to elicit the fact that, during the defendant's May 12 interview, law enforcement officers discussed the difference in potential sentences 28 times. Although defense counsel was not permitted to mention specific years or sentence length in Captain Cowan's cross-examination, he was allowed to use phrases such as "the big number" and "the big sentence" when referring to felony murder and "the lower number," "a really low number" and "the smaller number" when referring to the sentence associated with facilitation of felony murder. With the exception of being permitted to use the actual numbers, counsel was able to thoroughly cross-examine Captain Cowan about the circumstances attendant to the defendant's admissions and the techniques employed during the interview. The same substantive information came before the jury even without providing in detail the years of the potential sentences. As such, the defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

Next, the defendant contends that the evidence is insufficient to support his conviction of felony murder because, independent of the defendant's confession, insufficient corroborating evidence exists to link the defendant to the crime. In addition, the defendant argues that the jury verdict is against the weight of the evidence. The State argues that the evidence sufficiently corroborated the defendant's statement that he was involved in the crime and that the evidence adduced at trial supports the jury verdict.

We review the defendant's claim of insufficient evidence mindful that our

-16-

standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

To be sure "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti." *See State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The corpus delicti consists of two elements: (1) a certain result has been produced and (2) some person is criminally responsible for the act. *See State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The State needs "only slight evidence of the corpus delicti . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. Furthermore, when a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951)). "Whether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). All elements of the corpus delicti may be established by circumstantial evidence. *State v. Garmon*, 972 S.W.2d 706, 708 (Tenn. Crim. App. 1998).

First degree murder, as charged in this case, is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, [or] theft." T.C.A. § 39-13-202(a)(2). "Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a). "Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id.* § 39-14-403(a). Finally, "[e]specially aggravated kidnapping is false imprisonment, as defined in § 39-13-302: . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to

reasonably believe it to be a deadly weapon." *Id.* § 39-13-305(a)(1).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

With respect to the corpus delicti, we hold that the State met its burden of proof. The discovery of Mr. Graves with a fatal wound and the testimony that the cause of death was homicide established the result of death and that someone was criminally responsible. In addition, the testimony of Mrs. Graves established the commission of the other offenses. We find this evidence more than sufficient to establish the "slight evidence of the corpus delicti" required by law. *See Smith*, 24 S.W.3d at 281.

Concerning the issue of the general sufficiencies of the evidence, Mrs. Graves testified that only a small number of people knew about the safe in her home and that she had, at one time, stored her nephew Tony's medication in that safe in her home. That list of people included the defendant's sister, Ms. Wood, and "whoever Tiffany told," which "more than likely" included the defendant. In addition, Ms. Wood knew that Mrs. Graves received the proceeds from Tony's life insurance policy following his death. The proof showed that Mr. Bowman and Mr. Holman did not know Mr. and Mrs. Graves and had never been to their house before, whereas the defendant, Mrs. Graves's nephew, was familiar with and had visited their home on previous occasions. During the commission of the crime, Mr. Bowman told Mr. Holman to "[g]et the safe," and before exiting the residence, Mr. Holman retrieved the safe located in the closet behind the front door. Mrs. Graves testified that the two men fled with the safe, which was later recovered in the road in front of her house. Mrs. Graves also testified that she heard the "pop" of the gunshot when her husband was attempting to get away from Mr. Bowman, and Doctor Cogswell testified that Mr. Graves died as a result of the gunshot wound to his thigh. Doctor Cogswell further opined that the manner of death was homicide.

The testimony of Detective Gibson revealed that the defendant had been in contact with Mr. Bowman almost every day for over two weeks leading up to the commission of the crime and that the two men continued to exchange telephone calls in the days

following the crime. Detectives located work gloves and a pair of boots in the trunk of Mr. Bowman's car, both of which were stained with Mr. Graves's blood. Following their arrests, both Mr. Bowman and Mr. Holman confessed to their involvement in the crimes.

Without question, these crimes would not have occurred but for the defendant's involvement. When Mr. Bowman contacted the defendant looking for a way "to make some money," the defendant told him he "might know somewhere you can get a safe or something." The defendant drove Mr. Bowman and Mr. Holman past the Graves's house and then returned just before dark, parking the car at the end of the Graves's street. Although the defendant testified that he did not see Mrs. Graves's car at her house and that her front door was closed, Mrs. Graves testified that at least three cars were in the vicinity of the house and that the front door was, in fact, open. Both the vehicles and the front door of the house were visible from the street.

The State presented evidence that Mr. Bowman shot Mr. Graves and that the gunshot wound proved fatal. Mrs. Graves testified that Mr. Holman falsely imprisoned her with the use of a deadly weapon, by aiming his gun at her head and ordering her to sit down and later by tackling her and holding her down on the loveseat. Mr. Bowman and Mr. Holman stole the Graves's safe, which was located by police in the middle of the street in front of the Graves's house.

When Mr. Bowman and Mr. Holman returned to the car, Mr. Bowman became very emotional and indicated to the defendant that he had shot Mr. Graves. Mr. Bowman and Mr. Holman then discussed the cleaning of the gun used to shoot Mr. Graves and the disposal of both guns by the side of the road. The defendant did not report these crimes to the authorities. Indeed, he returned home, and when contacted by the authorities, he purposely misled them, giving them the names of 16 potential suspects, none of whom were involved in the crime.

Although the defendant told law enforcement officers that he did not know his accomplices were armed and that he believed the victims' house to be unoccupied on the night the crimes were committed, it is clear that the jury rejected his testimony, as was their prerogative.

Viewing this evidence in the light most favorable to the prosecution, we find the evidence adduced at trial more than sufficiently established that the defendant was criminally responsible for the acts of Mr. Bowman and Mr. Holman and thus is guilty of felony murder, especially aggravated robbery, aggravated burglary, and especially aggravated kidnapping. We address the defendant's conviction of employing a firearm during the commission of a dangerous felony in the following section.

*IV. Employing a Firearm During the Commission of a Dangerous Felony*

As charged in count three of the indictment, "it is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). The indictment in this case also charged the defendant with aggravated burglary and especially aggravated kidnapping, both of which are designated as dangerous felonies in Code section 39-17-1324. *See id.* § 39-17-1324(i)(1). That being said, the State failed to allege a predicate felony in the indictment for the charge of employing a firearm during the commission of a dangerous felony. Although neither party raises the issue, "the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation," *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997), and the failure of an indictment to provide constitutionally adequate notice results in a void indictment requiring dismissal of the charge. Thus, we examine the issue to determine whether the failure to name a predicate felony in the indictment for the firearms offense voids the indictment, thereby rising to the level of plain error.

Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

As a general rule, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Id.* (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Tennessee Code Annotated section 40-30-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

T.C.A. § 40-13-202 (2006). "[T]he touchstone for constitutionality is adequate notice to the accused." *Hill*, 954 S.W.2d at 729.

The indictment in this case alleged that the defendant employed a firearm during the commission of a dangerous felony but did not allege any of the enumerated dangerous felonies in Code section 39-17-1324. *See* T.C.A. § 39-17-1324(i)(1). The statute requires that the underlying dangerous felony be included as a separate count in the same indictment, *see id.* § 39-17-1324(d) ("A violation of subsection (a) or (b) is a specific and separate offense, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony"), but it is silent on whether the predicate dangerous felony must be named in the count charging a violation of Code section 39-17-1324.

In *State v. Michael L. Powell and Randall S. Horne*, this court, citing *State v. Christopher Ivory Williams*, noted that the State's failure to allege a predicate felony in an indictment for a violation of Code section 39-17-1324 "present[ed] a close question" but ultimately concluded that it was "not necessary to determine whether the indictment was adequate to charge the firearms offenses" given other issues attendant to that conviction. *State v. Michael L. Powell and Randall S. Horne*, No. E2011-00155-CCA-R3-CD, slip op.

-21-

at 18 (Tenn. Crim. App., Knoxville, May 10, 2012). In *Christopher Ivory Williams*, this court addressed Williams' claim "that because the felony murder count did not specify the underlying felony, it failed to place him on notice of the appropriate mens rea for the underlying offense and failed to fulfill the requirements set out in *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)." *State v. Christopher Ivory Williams*, No. W2009-01638-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Jackson, May 9, 2011). We observed that although "the State intended to prove that the killing was committed in the perpetration of kidnapping or robbery . . . neither of these underlying offenses were specifically stated in the felony murder count of the indictment." *Id.*, slip op. at 12. Noting that "the underlying felonies listed in section 39-13-202(a) have differing mens rea" and that "[p]roof of the intent to commit the underlying felony, and at what point it existed, [are] question[s] of fact to be decided by the jury after consideration of all the facts and circumstances," we concluded that the failure to include a predicate felony in the felony murder indictment "failed to provide Williams with notice of the underlying offense and its mens rea, which resulted in an invalid indictment and precluded a lawful felony murder conviction." *Id.*

Generally, an indictment for a violation of Code section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged. This is so even when the indictment, as does the one in this case, tracks the statutory language of Code section 39-17-1324 and names the statute itself. These statutory references are insufficient because Code section 39-17-1324 provides 11 options for dangerous felonies that would support conviction. The failure of the indictment to name the underlying dangerous felony typically leaves the defendant with inadequate notice of the charges against him. Only "'where the constitutional and statutory requirements outlined in *Hill* are met," will "'an indictment that cites the pertinent statute and uses its language" be deemed "sufficient to support a conviction.'" *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999) (quoting *State v. Ruff*, 978 S.W.2d 95, 100 (Tenn. 1998)).

That being said, that the charge of employing a firearm during the commission of a dangerous felony was part of an indictment that included the charge of aggravated burglary that the State intended to serve as the predicate felony directly precedent to the firearms count saves that count in this case. Although "[e]ach count must be a complete indictment within itself, charging all the facts and circumstances that make the crime," *State v. Lea*, 41 Tenn. 175, 177-78 (Tenn. 1860), where "it is reasonably clear from the averments of the second count that this is connected with and a part of the preceding count . . . such a count may be considered good." *State v. Youngblood*, 287 S.W.2d 89, 91 (Tenn. 1956); *see also State v. Cureton*, 38 S.W.3d 64, 82 (Tenn. Crim. App. 2000) (holding, post-*Hill*, that where all counts in an indictment referred to the same victim, the same offense date, and were related to each other, the counts could be read together for purposes of providing notice to the defendant); *State v. James Ruben Conyers*, No. M2002-01007-CCA-R3-CD, slip op.

at 19 (Tenn. Crim. App., Nashville, Sept. 5, 2003) (holding that a count charging attempted first degree murder that was otherwise invalid for failure to name a victim could be read together with the other counts of the indictment to supply the name of the victim because the defendant was charged via a single-page indictment with three offenses committed against the same victim on the same date).

In this case, only counts one, two, and three appear on the first page of the ten-count, four-page indictment. The first two counts charge the defendant with the aggravated burglary of the habitation of the victims, and the third count charges the defendant with employing a firearm in commission of a dangerous felony. Although none of the counts allege a specific date, all counts aver the offenses were committed in May 2009. Because the aggravated burglary charges, and no other counts alleging a dangerous felony, immediately precede the charge of employing a firearm during the commission of a dangerous felony, we believe it is "reasonably clear" that count three is connected to the preceding counts of aggravated burglary such that the indictment is not void for lack of notice. *Youngblood*, 287 S.W.2d at 91. Thus, the failure of the State to specify the predicate felony in count three of the indictment does not amount to plain error.

Finally, because the evidence established that the defendant was guilty of employing a firearm during the burglary of the Graves's residence by virtue of his being criminally responsible for the actions of his accomplices, *see Lemacks*, 996 S.W.2d at 170, the defendant's conviction of that charge is affirmed.

## V. Witness Statement

The defendant next contends that the trial court erred by admitting the testimony of Ms. Stafford, claiming that her testimony was irrelevant because the defendant had admitted in his statement that he knew where the Graves's house was located. We disagree.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

-23-

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We find no abuse of discretion in the trial court's decision to allow the testimony of Ms. Stafford. The fact that the defendant admitted knowing the location of the Graves's house does not render Ms. Stafford's testimony needlessly cumulative. Her testimony tends to prove the defendant's familiarity with the Graves's house and street and his knowledge of the security camera, which are clearly facts of consequence to the determination of this case. Accordingly, the admission of Ms. Stafford's testimony was not error.

*VI. Consecutive Sentencing*

Finally, the defendant challenges the trial court's decision to impose consecutive sentences. The defendant concedes that, by law, the conviction of employing a firearm during a dangerous felony must be served consecutively to the life sentence for felony murder, but he contests the trial court's decision to order the six-year sentence for aggravated burglary to be served consecutively to the life sentence.[6]

Since the passage of the 1989 Sentencing Act, our standard of review when considering challenges to the length and manner of service of a sentence has been de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006) ("When reviewing sentencing issues raised pursuant to subsection (a), including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). In 2005, the general assembly amended the Sentencing Act to bring our

---

[6]The defendant's concession is incorrect. Code section 39-17-1324 provides that "[a] sentence imposed for a violation of subsection (a) or (b) shall be served consecutive[ly] to any other sentence the person is serving at the time of the offense or *is sentenced to serve for conviction of the underlying dangerous felony.*" T.C.A. § 39-17-1324(e)(1) (emphasis added). Thus, the statute requires that the six-year sentence imposed for a violation of Code section 39-17-1324(b) be served consecutively to the sentence imposed for aggravated burglary, the underlying dangerous felony in this case.

sentencing law into compliance with federal constitutional requirements as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. Notably, the 2005 revisions rendered advisory the enhancement and mitigating factors and removed the presumptive sentence to be imposed by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In a number of cases following passage of the 2005 amendments, our supreme court signaled that the statutorily prescribed standard of review, de novo with a presumption of correctness, might be at odds with what had become a far more discretionary sentencing scheme. *See, e.g.*, *Carter*, 254 S.W.3d at 344, 346. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), the court again wrestled with the "the precise metes and bounds of appellate review under the current increased trial court discretion structure" but ultimately left the issue unsettled. *State v. Cross*, 362 S.W.3d 512, 529 (Tenn. 2012). The court visited the issue most recently in *State v. Bise*, and ultimately concluded that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* The court held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness'" afforded to sentencing decisions of the trial court. *Id.* at 708.

The supreme court observed, however, that in making its sentencing decision, a trial court must consider the principles of sentencing enumerated in Code section 40-35-210(b):

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and

-25-

40-35-114;

> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*see Bise*, 380 S.W.3d at 698 n.33(citing T.C.A. § 40-35-210(b)), 706 n.41. By statute, the trial court must also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from" the Sentencing Act. *Id*. at 706. Thus, under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The Sixth Amendment considerations attendant to the trial court's imposition of sentence length, however, are not implicated by the trial court's decision regarding alignment of sentences. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009); *State v. Allen*, 259 S.W.3d 671, 688 (Tenn. 2008) (ruling Sixth Amendment *Blakely* challenges inapplicable to consecutive sentencing). Consequently, until we are otherwise instructed by our supreme court, our standard of review when considering challenges to the alignment of sentences should remain de novo with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006); *see also id.* § 40-35-401(a) ("The defendant in a criminal case may appeal from the length, range or manner of service of the sentence imposed by the sentencing court. The defendant may also appeal the imposition of consecutive sentences."). The presumption of correctness afforded the trial court is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id.*

When a defendant is convicted of multiple crimes, the trial court, in its

discretion, may order the sentence to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender"

category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698,707-08 (Tenn. 2002).

In the instant case, the trial court based its decision to order consecutive sentencing on both the defendant's extensive history of criminal activity and its finding that the defendant was a dangerous offender. *See* T.C.A. 40-35-115(b)(2), (4). With respect to the defendant's criminal history, the trial court noted that the defendant had a previous conviction for felony theft in addition to the multiple felony convictions in the instant case. "Current offenses may be used in determining criminal history for the purposes of consecutive sentencing." *State v. Carolyn J. Nobles*, No. M2006-00695-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Nashville, Mar. 7, 2007) (citing *State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)). In determining the defendant to be a dangerous offender, the trial court also made the requisite *Wilkerson* findings, holding that "the sentence is reasonably related to the severity of the offenses," referencing "the loss of a life of a family member," and that the consecutive sentences "are necessary in light of all these facts to protect the public from further criminal acts" by the defendant. Under these circumstances, we find no error in the trial court's decision to impose consecutive sentencing.

*VII. Conclusion*

The trial court properly denied the defendant's motion to suppress his statement to law enforcement. The trial court did not commit reversible error by denying the defendant's request to admit his unedited statement to law enforcement officers. The evidence is sufficient to support the defendant's convictions, and the trial court did not err by admitting the testimony of Ms. Stafford or by imposing consecutive sentencing. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE